**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**
Mark C. Rifkin
Thomas H. Burt
270 Madison Ave.
New York, New York 10016
Tel.: (212) 545-4600
Fax: (212) 686-0114
rifkin@whafh.com
burt@whafh.com

**PEARSON, SIMON & WARSHAW, LLP**
Daniel L. Warshaw
Benjamin E. Shiftan
15165 Ventura Blvd. #400
Sherman Oaks, CA  91403
Tel.: (818) 788-8300
Fax: (818) 788-8104
dwarshaw@pswlaw.com
bshiftan@pswlaw.com

*Counsel for Plaintiffs (Additional Counsel are Listed on Signature Page)*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| CAMP GROUNDS COFFEE, LLC; 803 KAVA LLC; MAUREEN ROXBERRY; and SHEN SHU ACUPUNCTURE, PLLC, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br><br>VISA, INC. and MASTERCARD, INC.,<br><br>Defendants. | Case No.   1:21-cv-03401<br><br><br><br><br><br>Jury Trial Demanded |

## CLASS ACTION COMPLAINT ON BEHALF OF
## INDIRECT-PURCHASER "SQUARE SELLERS"

This class action complaint is brought by plaintiffs Camp Grounds Coffee, LLC; 803 Kava LLC; Maureen Roxberry; and Shen Shu Acupuncture, PLLC (collectively "Plaintiffs") against defendants Visa, Inc. ("Visa") and MasterCard, Inc. ("MasterCard") (collectively, "Defendants") on behalf of businesses that obtain credit-card acceptance service via nonparty Square, Inc. ("Square") and that are located in the following states: Arizona, California, Connecticut, District of Columbia, Florida, Hawaii, Iowa, Illinois, Kansas, Maine, Michigan, Minnesota, Mississippi, North Carolina, North Dakota, Nebraska, New Hampshire, New Mexico, Nevada, New York, Rhode Island, South Dakota, Utah, Vermont, West Virginia and Wisconsin (the "Covered States").

## I. **INTRODUCTION**

1.      More than one million small businesses use the service provided by Square to accept credit and debit card transactions on the Visa and MasterCard networks in the Covered States.  On each such transaction, Square serves as the merchant of record for purposes of the Visa and MasterCard networks and incurs fees, collectively referred to as "Merchant Discount Fees," to Visa, MasterCard and their participating banks.  Square then passes all of these costs along to the merchants that use the Square service—merchants that Square refers to as "Sellers." Specifically, on every payment card transaction, Square charges the Seller a fee (termed a "Transaction Fee") in an amount that is set high enough to cover the merchant discount fees and other costs that Square incurs.  The merchant discount fee accounts for the vast majority of the Transaction Fee that Square charges its Sellers.

2.      In turn, the overwhelming majority of the Merchant Discount Fee is comprised by the so-called "Interchange Fee"—a non-negotiable fee that the merchant is obligated to pay to the card-issuing bank on each credit-card transaction under Visa and MasterCard rules.  The

1

obligation to pay the Interchange Fee is the product of horizontal price-fixing agreements among the card-issuing banks that comprise the Visa and MasterCard networks. The Interchange Fee is purely a toll that the credit-card issuing banks, in a collective exercise of monopoly power, decided to levy on each credit card transaction.

3. To maintain their elevated interchange fee levels, the banks also enacted rules to ensure that Visa and MasterCard would never have to compete against other networks, or one another, in setting Interchange Fees. Indeed, Visa and MasterCard fully insulated themselves from price competition by mandating that merchants may not use the mechanism of price to induce consumers to use particular card brands or products. Among these vertical restraints is the "No-Surcharge Rule," which prevents merchants from imposing a charge (or "Surcharge") for Visa or MasterCard credit card transactions and substantially forecloses inter-brand price competition. In the absence of the No-Surcharge Rule, merchants could induce consumers to use payment products that impose lower costs upon the merchant than do Visa-branded or MasterCard-branded credit cards. If merchants had been free during the relevant period to use credit-card surcharging to steer consumers to less costly payment options, such as debit cards, then Defendants would have faced the prospect of losing consumers and would therefore have been pressured to reduce their merchant pricing. The No-Surcharge Rules, however, have at all times insulated Defendants from such competition.

4. Through the Transaction Fees that Sellers pay to Square, the Sellers ultimately pay the Interchange Fees that are set by the Visa and MasterCard networks. But because Square is the merchant of record for the Sellers' transactions—and because Sellers do not deal directly with Visa- and MasterCard-affiliated institutions to process their credit card transactions—

2

Sellers are "indirect purchasers" of the network services offered by Visa and MasterCard, within the meaning of the federal antitrust laws and *Illinois Brick v. Illinois*, 431 U.S. 720 (1977).

5.      This class action asserts claims under the laws of states that permit suits by indirect purchasers.  Plaintiffs are Sellers who use the Square service to accept credit and debit card transactions on the Visa and MasterCard networks.  In these transactions, it is Square that serves as the direct purchaser of Visa and MasterCard network services.  But while Square is the direct payer of Interchange Fees, it passes along 100% of those costs to the members of the plaintiff class.  It is the members of the plaintiff class who ultimately incur the overcharge that is the subject of this antitrust suit.  And these class members are thus entitled to sue as indirect purchasers under the laws of the states represented in this action.

## II.  JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d).  This action is brought pursuant to the laws of Arizona, California, Connecticut, District of Columbia, Florida, Hawaii, Iowa, Illinois, Kansas, Maine, Michigan, Minnesota, Mississippi, North Carolina, North Dakota, Nebraska, New Hampshire, New Mexico, Nevada, New York, Rhode Island, South Dakota, Utah, Vermont, West Virginia and Wisconsin.  With respect to each of these jurisdictions, the class member plaintiffs seek damages in excess of $5 million and there exists at least minimal diversity among the parties.

7.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## III. THE PARTIES

8.      Plaintiff Camp Grounds Coffee, LLC is a limited liability company organized under the laws of the State of Wisconsin and has its principal place of business at 69 N. Brown Street, Rhinelander, WI 54501.  Camp Grounds Coffee, LLC does business as Tilly's and accepts all major credit and debit cards via Square.

9.      Plaintiff 803 Kava LLC is a limited liability company organized under the laws of the State of New York and has its principal place of business in New York, New York.  803 Kava LLC does business as Kava Café and accepts all major credit and debit cards via Square.

10.     Plaintiff Maureen Roxberry is a citizen of the State of Michigan.   Ms. Roxberry works as an independent hairdresser and accepts all major credit and debit cards via Square.

11.     Plaintiff Shen Shu Acupuncture, PLLC is a professional limited liability company organized under the laws of the State of New York having a business address of 124 E. 40th Street, 904A, New York, NY 10016.  Shen Shu Acupuncture accepts all major credit and debit cards via Square.

12.     Defendant Visa, Inc. is a Delaware corporation with its principal place of business in San Francisco, California.  Visa, Inc. owns and operates the Visa payment card network.

13.     Defendant MasterCard, Inc. is a Delaware corporation with its principal place of business in Purchase, New York.  MasterCard, Inc. owns and operates the MasterCard payment card network.

## IV. FACTUAL BACKGROUND

### A.     Anatomy of a Credit-Card Transaction

14.     The following illustration helps explain the workings of a typical credit card transaction for Square Sellers and introduces some relevant concepts and terms.

15.     A hypothetical customer wishes to make a $100 purchase from Seller X using a Visa-branded credit card that was issued to her by a Visa-licensed "Issuing Bank" such as Wells Fargo.  Seller X invites the customer to insert her credit card into the Seller's Square-supplied point-of-sale hardware—whether an attachment (or "dongle") that plugs into a tablet or smartphone, or a standalone device.  Square's software then immediately sends an electronic record of the $100 transaction to Square, whose computers then send the transaction on to Square's "Acquiring Bank"—i.e., a financial institution affiliated with the Visa network that contracts with merchants to handle their payment card transactions.  Square's principal Acquiring Bank is Chase Paymentech.

16.     Having received the $100 transaction message from Square, Chase Paymentech then sends the message on to the Visa network, which in turn directs the message to Wells Fargo, the customer's Issuing Bank.  If there are sufficient funds or credit on hand and the account is in good standing, Wells Fargo then transmits an authorizing message back via the network, and the Acquiring Bank (Chase Paymentech) then commits to "acquire" the transaction from the merchant (Square), for the face amount minus a discount—i.e., for the Merchant Discount Fee, also referred to as the "Swipe Fee."  This whole process unfolds in seconds, or less, with each swipe or insertion of a card.

17.     The Merchant Discount Fee has several components, the majority of which is comprised of the Interchange Fee that is paid to the Issuing Bank on each transaction.  The Interchange Fee level, or "Interchange Rate," is set centrally by Visa (or MasterCard, as the case may be) and varies according to such factors as merchant industry (e.g., gas stations vs.

restaurants vs. airlines), merchant annual dollar volume levels, the type of credit card used (high-reward, regular-reward, other) and the physical device on which the transaction was entered (chip reader vs. manually keyed), among other things.

18.     In addition to the mandatory and non-negotiable Interchange Fee, the Merchant Discount Fee includes a fee for the acquiring bank's services ("Acquirer's Fee") and certain fees that flow to Visa itself, for the operation of the Visa network ("Network Fees").  The Acquirer's Fee is often denominated as a fixed mark-up over interchange (a so-called "Interchange-Plus" contract) or may be some other pre-set amount.

19.     For this example, let's say the total Merchant Discount Fee is 2.2% and, of this, the Interchange Fee is 2%.  In that case, the Acquiring Bank, Chase Paymentech, will deposit a total of $97.80 in Square's bank account, representing the face amount of $100 minus 2.2%.  Separately, Wells Fargo will pay Visa and Chase Paymentech a total of $98 and will bill its customer for $100, pocketing a $2 Interchange Fee.  Meanwhile, the Transaction Fee that Square charges its Sellers is 2.6% plus 10 cents.  Thus, Square will deposit into Seller X's account $97.30.

**B.     *Indirect Purchaser Structure***

20.     One consequence of this structure—where Square receives payment from the Acquiring Bank in the amount of total sales minus the Merchant Discount Fee—is that Square is the "direct purchaser" of card acceptance services within the meaning of the federal antitrust laws.  Square, therefore, has sole standing to pursue federal antitrust damages claims arising out of the Merchant Discount Fee even where—as here—Square passes 100% of the overcharge on to its downstream retailers.  (*See Hanover Shoe v. United Shoe Machinery Corp.*, 392 U.S. 481 (1968)).

21.     But while Square Sellers do not have standing to sue Visa or MasterCard as direct purchasers of card acceptance service under the federal antitrust laws, they do have standing to sue as indirect purchasers under the laws of certain states.  The states represented in this class action have all rejected the limitation of *Illinois Brick*, whether legislatively or via common law, and allow injured persons to sue for damages irrespective of whether they were injured directly or indirectly.

## C.     MDL 1720 Litigation

22.     On December 16, 2019, the U.S. District Court for the Eastern District of New York (Brodie, J.) approved a class action damages settlement in *In re Payment Card Interchange and Merchant Discount Antitrust Litig.*, No. 05-md-1720, a federal multi-district litigation (the "MDL 1720" case).  The merchant damages class in MDL 1720 asserted claims against Visa, MasterCard and leading banks related to the No-Surcharge Rules, other vertical restraints, and interchange price-fixing conspiracies.

23.     The MDL 1720 settlement is on behalf of *direct* purchasers only.  As the Court observed in approving the settlement, "the class definition is [ ] objectively guided by federal antitrust standards," specifically including *Illinois Brick*.  (Memorandum & Order, MDL 1720, ECF No. 7821 at 67.)  The Court made clear that the class representatives in MDL 1720 represented, and could represent, "only the first payer"—i.e., only "the direct purchaser, and not every entity in the payment chain."  (*Id.,* quoting Class Counsel.)  Thus, the MDL 1720 settlement was on behalf of direct purchasers only, and indirect purchasers are ineligible to receive settlement distributions in the claims process established by the Court.

24.     By the same token, the liability releases provided to the defendants in the MDL 1720 settlement do not bind indirect purchasers.  Claims against Visa and Mastercard by indirect

purchasers of Visa and Mastercard card acceptance services are not barred by the release of liability contained in the MDL 1720 settlement.   Thus, as the defendants acknowledged in their brief defending the settlement before the Second Circuit, a merchant "that is deemed not to be the appropriate claimant for any of its Visa or Mastercard transactions is not a class member and thus not bound by the release. If that non-class member has a claim—for example, because it is an indirect payor with a claim under state law—it will retain that claim, subject to any applicable defenses."

25.     Square is a direct purchaser in MDL 1720.  According to a list of exclusion requests received by the class administrator and appended to the district court's December 13, 2019 settlement approval order, Square exercised its right to opt out of the Rule 23(b)(3) class settlement.  (MDL 1720, ECF No. 7818-1 at 13.)

**D.     *No-Surcharge Rules in The United States***

26.     In the 1970s, when the credit-card industry was still nascent and its success far from assured, Congress was persuaded to enact a temporary ban on credit card surcharging.  (*See* Pub. L. No. 94–222, 90 Stat. 197 ("No seller in any sales transaction may impose a surcharge on a cardholder who elects to use a credit card in lieu of payment by cash, check, or similar means.").)  Within a few years, however, as credit cards flourished, it became obvious to everyone but the credit-card companies that the anti-surcharging provisions stifled competition. "Not one single consumer group supports the proposal to continue the ban on surcharges," observed Senate Banking Chair William Proxmire. "[But] the nation's giant credit card companies want to perpetuate the myth that credit is free."  (Irvin Molotsky, Extension of Credit Surcharge Ban, N.Y. Times, Feb. 29, 1984, at D12.)

27.     With consumer advocates, economists and Reagan Administration officials testifying that the no-surcharge statute stymied competition and supported regressive subsidies running from poor cash payers to affluent credit-card users, Congress let the surcharge ban lapse in 1984.  As a consequence, Visa, MasterCard and American Express commenced lobbying state legislatures, ultimately convincing some ten states to enact bans on credit-card surcharging.  The networks also implemented or strengthened their own No-Surcharge Rules and other provisions restraining merchants from steering transactions to cheaper payment forms.

28.     The defendants' contractual rules against surcharging came under attack in 2005, with the filing of *Animal Land, Inc. v. Visa USA Inc.*, No. 05-cv-1210 (N.D. Ga.) (filed May 6, 2005)*,* which was followed by filings around the country challenging Visa and MasterCard rules. All of these cases were then centralized in MDL 1720, along with merchant cases challenging the networks' interchange fees as the product of conspiracy.

29.     In 2010, the United States Department of Justice, Antitrust Division, decided to challenge the anti-steering rules of the three largest networks—Visa, MasterCard and American Express—as unlawful restraints on competition under the federal antitrust laws.  But, for reasons unrelated to the merits, DOJ officials determined to focus their cases on the rules banning "soft" steering practices—i.e., rules against offering discounts for using competitors' services, or against steering verbally or via signage—and to leave the more politically fraught issue of credit-card surcharging to the private litigation.

30.     Thus, on October 4, 2010, the DOJ announced that it had reached consent decrees with Visa and MasterCard under which the two networks would essentially rescind all of their soft steering bans.  The consent decree, which did not address credit-card surcharging, was approved by the district court and the networks revised their rules accordingly.  Meanwhile,

unable to reach agreement with American Express, DOJ filed suit against Amex in October 2010, challenging its anti-steering rules.

31.     In 2012, Visa and MasterCard reached tentative agreements to settle the MDL 1720 class action.  In early 2013, with the settlement approval process still ongoing, Visa and MasterCard modified their No-Surcharge Rules to read as they do today (as detailed below).  In December 2013, the district court approved that settlement but the Second Circuit subsequently reversed, for reasons not pertinent here.  *In re Payment Card Interchange Fee & Merch. Disc. Antitr. Litig.,* 827 F.3d 223 (2d Cir. 2016).  Meanwhile, Visa and MasterCard retained their rules as modified in 2013.

32.     Also in the 2013 time frame, merchants started to bring constitutional challenges to the state statutes that ban credit-card surcharges.  Challenges to the anti-surcharging statutes of three states—California, Texas and Florida—were litigated to conclusion and the plaintiffs prevailed on the merits in each case.  *See Italian Colors Rest. v. Becerra*, 878 F.3d 1165 (9th Cir. 2018) (striking California statute); *Dana's Railroad Supply v. Attorney General, Florida*, 807 F.3d 1235, 1239 (11th Cir. 2015) (striking Florida statute); *Rowell v. Paxton*, 336 F. Supp. 3d 724, 726 (W.D. Tex. 2018) (striking Texas statute following remand).  Today, while no-surcharge laws remain on the books in a handful of states, none are constitutional and none would survive a challenge.

**E.     *The No-Surcharge Rule Today***

33.     The No-Surcharge Rules of Visa, MasterCard and rival credit card networks prevent merchants from using the price mechanism to give customers incentives to use less expensive payment products.  These rules are binding upon all merchants that accept Visa and

MasterCard cards.  Square expressly requires that Sellers must abide by the networks' rules, which are published on their websites.

34.     As presently constituted, Visa's No-Surcharge Rule is set forth at § 5.5 of the public version of its Merchant Rules, available on Visa.com.[1]  Section 5.5.1.4 is entitled "Similar treatment of Visa transactions" and provides that a "Merchant must not assess a US Credit Card Surcharge on Visa Credit Card Transactions" if (among other restrictions) the "Merchant is prohibited or effectively prohibited by a Competitive Credit Card Brand from assessing surcharges on the Competitive Credit Card Brand's products."  (*Id.* at p. 343, first bullet.)

35.     MasterCard's No-Surcharge Rule mirrors Visa's No-Surcharge Rule.  It is set forth at § 5.11.2 of the public version of the MasterCard Rules, dated December 2019, available on Mastercard.com.[2]

36.     American Express, naturally, is a "Competitive Credit Card Brand," within Visa Rule 5.6.1.4 and MasterCard Rule 5.11.2.  Thus, Visa and MasterCard's rules piggy-back on the No-Surcharge Rule imposed by American Express.  Specifically, the Amex rule that "effectively prohibit[s]" merchants from assessing surcharges on Amex transactions, *id.*, is found in American Express Merchant Rule §3.02, which provides that a merchant may not impose a surcharge upon an American Express credit or charge card unless the merchant also assesses the same surcharge on all "Other Payment Products."  That section specifically defines Other Payment Products to include Visa- and MasterCard-branded debit cards.

---

[1] The operative Visa merchant regulations are located in the "Visa Core Rules" (17 October 2020 Ed.), available at: https://usa.visa.com/dam/VCOM/download/about-visa/visa-rules-public.pdf.
[2] The operative Mastercard rules, published December 11, 2020, are available at: https://www.mastercard.us/content/dam/mccom/global/documents/mastercard-rules.pdf.

37.     But imposing a similar surcharge on debit cards as upon Amex and other credit cards is impossible.  Visa rules <u>ban</u> surcharges on debit card transactions.  (Visa Core Rule § 1.5.5.2.)  And even if debit card surcharges were allowed, it would not be economically rational to impose an equal surcharge on debit transactions, as would be required as a condition of surcharging credit cards, under the American Express rules that Visa and MasterCard incorporate by reference.  The main point of surcharging credit cards is to drive traffic to cheaper payment forms—and specifically to debit.  Across the U.S., the average merchant discount rate for purchases on Visa, MasterCard and American Express all exceed 2.5%.  Meanwhile, the average discount rate on debit transactions is well under 1%.  So debit is the product that merchants want to steer ***towards***, and not away from.  For this reason, American Express for all intents and purposes has a flat ban on surcharging.

38.     To summarize: Visa and MasterCard permit credit-card surcharges unless the merchant is "effectively prohibited" from surcharging Amex (or other) cards.  Amex only allows surcharging if the merchant also imposes the same surcharge on Visa debit card transactions.  But Visa flatly bans surcharges on debit card transactions.  It follows that Visa and MasterCard ban credit-card surcharges in the United States, for those merchants who accept American Express.  And American Express cards are accepted by merchants who account for well over 90% of Visa and MasterCard credit-card transaction volume, including Square Sellers.

39.     Visa's and MasterCard's network No-Surcharge Rules and other vertical restraints were not (and are not) reasonably related or necessary to the operations of the Visa or MasterCard networks.  They are also more restrictive than necessary to further any legitimate business objectives of Visa or MasterCard.

### G.    *Horizontal Conspiracy*

40.    Defendants' Interchange Fees and vertical restraints are products of unlawful price-fixing conspiracies.

41.    From their beginnings in the 1960s, the networks now known as MasterCard and Visa were owned and operated by consortia of card-issuing "Member Banks."  These Member Banks were competitors in all other walks of their banking life.  They competed daily for consumer business as credit card issuers, and in scores of other lines of banking business as well.  But they came together as a cartel to run the affairs of the payment networks they originally named "Bank Americard" and "Master Charge" and later rechristened as "Visa" and "MasterCard."  Among other things, they cooperated to establish mandatory non-negotiable schedules of payments—known as Interchange Fees—that merchants would be required to pay card-issuing banks out of each transaction.

42.    U.S. antitrust law allows competitors involved in a joint enterprise to cooperate with their rivals and even set prices, under certain circumstances.  (*See American Needle, Inc. v. National Football League*, 560 U.S. 183 (2010).)  But only to the minimal extent necessary to produce the joint product or service.  What competitors may not do is agree to extract monopoly rents from customers.  And yet, that is exactly what the Visa and MasterCard membership associations did in setting Interchange Fees.  Acting as a cartel, they conspired to impose a non-negotiable deadweight toll on every credit-card transaction.

43.    By the early 2000s, the cartel structure of the associations was creating legal risk for the Member Banks, who came to understand that they needed to restructure their organizations to limit antitrust liability.  In 2003, Mastercard and Visa lost an antitrust lawsuit brought by the federal government challenging certain of their network rules.  (*United States v.*

*Visa U.S.A., Inc.*, 163 F. Supp. 2d 322 (S.D.N.Y. 2001), *aff'd*, 344 F.3d 229 (2d Cir. 2003).) And while that case concerned only the ability of the associations to ban their members from issuing American Express and Discover cards, the networks grew concerned that similar antitrust litigation could jeopardize their Interchange Fees because they had effectively been adjudicated structural conspiracies of constituent banks.

44.     Thus, in 2003, Mastercard held a meeting attended by the banks represented on its Board of Directors, where they discussed the likelihood that interchange revenues would decline as a result of antitrust challenges.  The banks then directed MasterCard's management to review potential alternatives.  In 2004, MasterCard made another presentation to the banks represented on its Board of Directors, showing that a new business model could reduce the antitrust risk while preserving the revenue from interchange fees received by the banks.

45.     By 2005, merchants and their trade associations had begun filing lawsuits, which were aggregated in MDL 1720, challenging the networks as "structural conspiracies" or "walking conspiracies."  In response, MasterCard made the decision that it would undergo a restructuring in which the member banks would gradually divest themselves of ownership and control over the network via an initial public offering.  The driving purpose of the IPO was to avoid antitrust liability.

46.     Visa had likewise commenced studying an IPO and restructuring by 2005.  As with MasterCard, Visa's decision was driven entirely by the desire to mitigate the antitrust liability that comes with operating as a walking conspiracy.  Visa reasoned that the restructuring was necessary to stave off tens of billions of dollars of additional damages liability that it was incurring each year, while it operated as a cartel of banks.

47.     In the planning for both restructurings, bank executives sought and received assurances that the new "single-entity" networks would sustain the high interchange rates that the member-bank conspirators had established.  Bank executives expressed that they were "uneasy" about the "lack of any direct link between Interchange levels and the P/L of" an independent and self-interested network.  The major issuing banks thus wanted assurances from the networks that, following the IPOs, they would continue the cartel policy of extracting high interchange fees from merchants.  In response, MasterCard assured the CEO of Capital One that there would be "little to no change" in interchange fee policy, and it satisfied senior Citi bankers that MasterCard would have "the same objective, pre and post" IPO.

48.     Visa executives likewise sought to assuage bank issuer concerns that the IPO might alter the cartel's essential Interchange Fee strategy.  Thus, Visa's Head of Global Interchange Tolan Steele drafted an assurance to bank issuers that, "though the Directors to whom we bring interchange decisions may have changed, the process that we go through to develop and deploy interchange enhancements will remain largely the same."  The restructurings, meanwhile, gave the banks veto power over transactions that might allow large merchants (or other third parties) to acquire a substantial stake in the network and exert influence over interchange rates.  And most importantly, the restructurings left intact the No-Surcharge Rule and other vertical restraints that immunized interchange rates from competitive forces.

49.     In essence, what the IPO restructurings accomplished for the issuing banks was to create independent vehicles to manage their historical conspiracy.  The pre-IPO horizontal agreement by a cartel of bank competitors to extract monopoly rents from merchants in the form of Interchange Fees *continues* to injure merchants, even after the IPO restructurings.  The IPOs

simply institutionalized the banks' conspiracy.  The No-Surcharge Rules, in particular, ensure that these monopoly rents cannot be competed away.

50.     Not only do the vertical restraints sustain and protect the product of the original price-fixing conspiracies, but the vertical restraints are themselves the product of ongoing hub-and-spoke conspiracies.  As the District Court recognized in *Barry's Cut Rate Stores, Inc. v. Visa, Inc.*, No. 05-MD-1720, 2019 U.S. Dist. LEXIS 205335, at *182 (E.D.N.Y. Nov. 20, 2019), Visa and MasterCard (the hubs) maintain agreements with each of the major issuing banks (the spokes), under which each such bank agrees that its cards may only be used subject to the merchant restraints.  Each bank conspirator—including Citibank, Chase, Bank of America, Capital One, Wells Fargo and US Bank, among others— has covenanted in its agreements with Visa and MasterCard that it will adhere to the No-Surcharge Rule and other merchant restraints, and that it will not allow its cards to be used by merchants except at the default interchange rates set by Visa and MasterCard.

51.     In entering into and reaffirming these vertical agreements with Visa and MasterCard, each bank was aware that the other banks were committing to the same terms. Indeed, none of the banks would have agreed to the terms of its deal with Visa and MasterCard but for that bank's knowledge that its competitors are similarly bound.  It would "be disadvantageous for [the] Bank [conspirators] to adhere to the restraints unless they possessed knowledge that all others similarly situated would also adhere to those same restraints." (*Barry's Cut Rate Stores,* 2019 U.S. Dist. LEXIS 205335, at *182 (upholding allegations of the hub-and-spoke conspiracy).)  In fact, "it would be plainly contrary to the economic self-interest of a member bank to *independently* agree to a supracompetitive price for its cards, or to restraints that prohibit merchants from *steering purchasers to its cards.*" (*Id.;* emphasis in original.)

52.     The knowledge of each conspirator bank (spoke) that each other conspirator bank (spoke) has likewise agreed to the anticompetitive restraints with Visa and MasterCard (hubs) furnishes the "rim" that binds all of the anticompetitive vertical agreements between Visa and the conspirator banks into a single hub-and-spoke conspiracy with Visa and a single hub-and-spoke conspiracy with MasterCard.

## V.  RELEVANT MARKETS

53.     A relevant market exists, the product dimension of which is no broader than the network services delivered to both merchants and cardholders to facilitate credit and charge card transactions (the "Dual-Platform Credit-Card Services Market").

54.     Additionally, there exists a relevant product submarket that consists of the network services delivered to both merchants and cardholders to facilitate credit card transactions under the Visa brand (the "Dual-Platform Visa-Only Submarket"), and another such dual-platform submarket for transactions under the MasterCard brand (the "Dual-Platform MasterCard-Only Submarket").

55.     The relevant geographic dimension of the product markets and submarkets identified above, as an economic matter, is no broader than the United States.  As a legal matter, there further exist relevant geographic submarkets in each of the Class States.

A.     Dual-Platform Credit-Card Services Market

56.     There are very high barriers to entry in the Dual-Platform Credit-Card Services market.  Since 1985, only Discover has entered the relevant market and its market share has never exceeded 5%.

57.     As recommended by the U.S. Department of Justice and Federal Trade Commission, economists typically define markets for antitrust purposes with reference to the

"SSNIP" test, asking whether a hypothetical monopolist of a particular product (or service) could impose a "small but significant non-transitory increase in price" on that product (typically, on the order of 5-10%) without losing sufficient customers to render the price increase unprofitable. The aim of the SSNIP test is to identify the smallest product market within which a hypothetical monopolist or cartel could impose a profitable significant increase in price.

58.     A hypothetical monopolist of all credit and charge cards would easily be able to increase the price of credit and charge card transactions to merchants by 5-10% without losing sufficient business to render the SSNIP unprofitable.  Likewise, the hypothetical monopolist could increase the "two-sided price" of credit and charge card transactions (defined as the price imposed upon merchants minus the rebates or other value provided to cardholders) by 5-10% without losing sufficient business to render the SSNIP unprofitable.

59.     By the same token, even a substantial diminution in the "two-sided price" of a potential substitute product will not draw sufficient business away from the hypothetical monopolist of credit and charge cards to compel it to drop its prices—i.e., to compel the hypothetical monopolist to compete with producers of the potential substitute—because the no-surcharge rules explicitly prohibit the price competition that otherwise would have had that result.  A recent natural experiment proves this point.  Pursuant to authority conferred by the Durbin Amendment to the Dodd-Frank Wall Street Reform and Consumer Protection Act, the Federal Reserve in 2011 instituted a ceiling on the interchange fees on debit cards, effectively slashing rates by well over 50%.  The cost of credit-card transactions, relative to debit-card transactions, soared by far more than a 10% SSNIP (and was not meaningfully offset by benefit reductions on the cardholder side).  But there was no resulting large-scale shift from credit-cards over to debit. Nor did credit-card networks act to staunch any such feared exodus by reducing the

Interchange Fees for credit card acceptance or ramping up the benefits to credit card users.  If debit card transactions in fact competed within a single relevant product market with credit and charge card transactions, debit would have gained substantial volume at the expense of credit, absent significant price adjustments.  The fact that no such volume gains occurred in the debit card market plainly demonstrates that the debit card market is distinct from that for credit and charge cards.

B.    <u>Visa-Only and MasterCard-Only Submarkets</u>

60.    Courts recognize brand-specific dual-platform markets or submarkets where sufficient impediments exist to prevent customers from switching from the defendant's brand to other brands in response to price increases.  In the two-sided market context, a single-brand market definition is appropriate where the nature of the defendant's service ensures that customers will not switch transactions to a competing brand in response to price increases imposed on one side of the platform or the other.  *U.S. Airways Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 65-66 (2d Cir. 2019) (upholding allegations of two-sided single-brand product market).

61.    The No-Surcharge Rule and anti-steering rules of Visa and MasterCard are designed to prevent ready inter-brand switching in response to supracompetitive pricing.  As a result of these restraints—as augmented by the state statutes that until recently prohibited surcharging in states representing half of the U.S. population—merchants *cannot* respond to elevated pricing on the part of one brand by incentivizing the use of other lower-priced brands (whether evaluated on a one-sided or two-sided basis).  Cardholders, meanwhile, *will not* switch because the No-Surcharge Rule insulates them from the cost of Visa and MasterCard branded transactions and ensures merchants may not use price signals to induce them to switch.

62.     As a result of the restrictions against surcharging, a SSNIP imposed on Visa-branded transactions will not cause Visa to lose sufficient business to a competitor brand to render the SSNIP unprofitable.  And the same goes for MasterCard.  Accordingly, there exists both a Dual-Platform Visa-Only Submarket and a Dual-Platform MasterCard-Only Submarket.

## VI.  MARKET POWER AND DIRECT EFFECTS ON COMPETITION

63.     At all relevant times, Visa has had market power in the Dual-Platform Credit-Card Services Market.  The networks' No-Surcharge Rules and other vertical restraints ensure that merchants cannot use the tool of price to induce their customers to use credit and charge cards other than Visa's.  During the Class Period, Visa has had, and has exercised, the power to maintain prices for credit card transactions substantially above competitive levels.  At present, roughly 53% of all spending on credit and charge cards in the U.S. is on Visa-branded cards.

64.     At all relevant times, MasterCard has had market power in the Dual-Platform Credit-Card Services Market.  The networks' No-Surcharge Rules and other vertical restraints ensure that merchants cannot use the tool of price to induce their customers to use credit and charge cards other than MasterCard's.  During the Class Period, MasterCard has had, and has exercised, the power to maintain prices for credit card transactions substantially above competitive levels.  At present, roughly 22% of all spending on credit and charge cards in the U.S. is on MasterCard-branded cards.  Collectively, Visa and MasterCard account for roughly 75% of all credit and charge card volume in the United States.

65.     Separate and apart from market share, Visa's and MasterCard's market power in the multi-brand credit card services market is reinforced by rules against credit-card surcharging, including not just the rules of payment card networks but also, historically, state anti-surcharging

statutes.  Because of these rules, each network is able to maintain supracompetitive interchange fees without losing customers to competitors who charge less for the same service.

66.     Visa and MasterCard further have monopoly power in the Dual-Platform Visa-Only Submarket and Dual-Platform MasterCard-Only Submarket, respectively.

67.     Not only do the Defendants have market power, but extensive evidence demonstrates that the credit card networks' anti-steering rules have in fact harmed competition in the United States.  For instance, evidence adduced by the U.S. Justice Department, Antitrust Division, at a seven-week trial in 2015 illustrates how the anti-steering rules of Visa, MasterCard and American Express thwarted Discover's efforts to compete in the Dual-Platform Credit-Card Services Market by delivering services more cheaply than its competitors.

68.     Specifically, Discover "tried to develop a business model that involved charging lower prices to merchants than the other companies charged," and it offered merchants powerful incentives "if they would steer customers to Discover."  *Ohio v. American Express*, 138 S. Ct. 2274, 2293 (2018) (Breyer, J., dissenting) (summarizing findings in *United States v. American Express*, 88 F. Supp. 3d 143 (E.D.N.Y. 2015) (quotations and citations omitted)).  However, the district court found that these well-documented "efforts failed because of" the anti-steering rules of American Express, Visa and MasterCard.  *Id*.  The district court thus "found that the [anti-steering] provisions have limited or prevented price competition among credit-card firms for the business of merchants."  *Id*. at 2294.

69.     "As a result of the [Anti-Steering] provisions," Justice Breyer further observed, "competitors like Discover had little incentive to lower their merchant prices, because doing so did not lead to any additional market share.  The provisions thereby suppressed [] competitors' incentives to offer lower prices, resulting in higher profit-maximizing prices across the network

services market.  Consumers throughout the economy paid higher retail prices as a result, and

they were denied the opportunity to accept incentives that merchants might otherwise have

offered to use less-expensive cards."  *Id*. at 2294 (ellipses, brackets and quotations omitted).

70.     The factual findings of the district court that Justice Breyer relied upon, and that

plaintiffs rely upon in the preceding paragraphs, were all left undisturbed by the decisions of the

Second Circuit and Supreme Court in *United States v. American Express*, 838 F.3d 179 (2d Cir.

2016), *aff'd sub nom. Ohio v. American Express, supra.*

## VII. <u>INJURY-IN-FACT AND SUBSTANTIAL EFFECT ON COMMERCE</u>

71.     Plaintiffs and the other members of the Class have suffered injury-in-fact and

have lost money or property as a result of the antitrust violations and unfair competition that are

the subject of this Complaint.

72.     But for the illegal horizontal conspiracies that resulted in the establishment of

elevated Interchange Rates before the IPO restructurings, Visa and MasterCard would not have

been able to assess, and Plaintiffs would not have incurred, the inflated and supra-competitive

Interchange Fees that apply today.  The high Interchange Fee levels that were set pre-IPO have

continued post-IPO because of the anti-steering rules and No-Surcharge Rules, and further

because of features in the restructuring itself that were designed to preserve the status quo ante.

Moreover, were it not for the No-Surcharge Rule and other vertical restraints, Visa and

MasterCard would not have been able to maintain supracompetitive interchange rates during the

Class Period.  Because Class-member Square Sellers ultimately have incurred Transaction Fees

that include those supracompetitive Interchange Fees, the members of the Class have suffered

injury-in-fact.

73.     Defendants' violations of the various states' statutes set forth below substantially affected commerce in each of those states.

## VIII.  INJUNCTIVE RELIEF

74.     Defendants continue to maintain rules that prevent merchants from freely using price signals to steer customers to use cheaper payment products.  *See, e.g.*, Visa Core Rules 1.5.5.2 and 5.5.1.1; Mastercard Rule 5.11.2.  These restraints, taken together, operate to foreclose price competition among payment card networks in the provision of card acceptance services. Square Sellers and their customers have been, and continue to be, irreparably harmed by this foreclosure of price competition and otherwise continue to suffer injury for which there is no adequate remedy at law, including injuries that are likely to continue if not enjoined.

75.     The injunctive relief sought here will benefit not only merchants, but the general public as well.  Under the current no-surcharge restraints, merchants seeking to recoup their card-acceptance costs must increase the prices they charge all customers.  As leading national consumer advocacy groups have therefore recognized, rules prohibiting credit-card surcharges effectively impose a highly regressive tax on end-user consumers.  In amicus filings supporting merchant challenges to state anti-surcharging statutes around the country, groups including Consumer Action, the National Association of Consumer Advocates, National Consumers League and U.S. Public Interest Research Group have emphasized that "[t]he purpose and practical effect of the no-surcharge rule is to conceal the underlying true costs of credit by spreading those costs among all consumers."  The rule against surcharging, the consumer groups have explained, "forces merchants to recoup supra-competitive [swipe] fees by raising sticker prices for all consumers."   Among other things, these groups relied upon studies by Federal

Reserve economists quantifying the billions of dollars that cash-using households pay in regressive subsidies each year to credit-card networks.

76.     Importantly, the regressive subsidy that is paid by users of payment products other than high-rewards cards runs to the credit card companies, and not to their card-using customers.  In the absence of the No-Surcharge Rule and other anti-steering rules, card issuers would not diminish the rewards they offer to cardholders.  Indeed, the contrary is true: when merchants in foreign jurisdictions have been given the right to impose surcharges on credit-card transactions, the affected card-issuers have actually ***increased*** their rewards offerings in an effort to keep cardholders from switching to other non-surcharged payment forms.

77.     Accordingly, this action seeks injunctive relief that would rescind all restraints on merchant surcharging.  In addition, Plaintiffs seek an order directing the Defendants to inform consumers—i.e., the general public—that merchant surcharging is permissible, subject to any limits on surcharging that the Court may decide to allow.

## IX.  CLASS ACTION ALLEGATIONS

78.     **Class Definition:**  Plaintiffs bring this action on behalf of themselves and a class consisting of all persons located in the Covered States that, during the Class Period, have taken as payment a Visa or MasterCard branded credit card via the Square card acceptance service and have received payment for that transaction from Square (the "Class Members").   The Covered States are Arizona, California, Connecticut, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Rhode Island, South Dakota, Utah, Vermont, West Virginia, and Wisconsin.

79.    **Class Period**:  The "Class Period" shall mean the period running through the termination of this action and commencing four years prior to the filing of this Complaint, subject to the following exceptions: (i) for merchants in Maine, Vermont and Wisconsin, the Class Period shall be deemed to have commenced six years before filing; and (ii) for merchants in Kansas and Mississippi, the Class Period shall be deemed to have commenced three years before filing.  For all of the Covered States, the Class Period shall be deemed extended to the maximum extent allowed by any applicable principle of tolling.

80.    **Numerosity:**  Plaintiffs do not know the exact number of Class Members, but upon information and belief, there are roughly one million Class Members.

81.    **Typicality:**  The representative plaintiffs' claims and the defenses to those claims are typical of the claims and defenses of absent Class Members.  Each representative plaintiff was during the Class Period a Seller that obtained card acceptance services via Square, and is therefore situated similarly to other Class Members.

82.    **Adequacy:**  The representative plaintiffs will fairly and adequately represent the interests of the Class because their individual interests are consistent with, and not antagonistic to, the interests of the Class Members.  Moreover, Plaintiffs are represented by counsel who have the ability and financial means to prosecute this case as a class action and are experienced antitrust and class action attorneys who have successfully litigated other cases involving similar issues.

83.    **Common Questions Predominate:**  There are questions of fact and law that are common to the Class and that are apt to drive resolution of the litigation, including:

a.   Whether each of Visa and MasterCard entered into contracts, combinations or conspiracies to fix, raise, elevate, maintain or stabilize the fees for services provided in the relevant market;

b.   Whether the Dual-Platform Credit-Card Services Market alleged above constitutes a relevant antitrust market, and whether there exist brand-specific submarkets as set forth above;

c.   Whether each of Visa and MasterCard has market power in the Dual-Platform Credit-Card Services Market;

d.   Whether Defendants' conduct alleged in this Complaint violated the state statutes set forth below; and

e.   The amount of additional fees the Class incurred by reason of Defendants' violations of the state statutes set forth below.

84.    **Superiority:** A class action litigation under Rule 23(b)(3) is superior to any alternative means of resolving this controversy.  The compensation to each individual Class Member is small in relation to the expense and burden of the litigation that would be required to recover that compensation in individual litigation.  Indeed, for many Class Members, a class action is the only economically feasible means of seeking redress for the violations alleged herein.

## X.  CLAIMS FOR RELIEF

### CLAIM 1

**VIOLATION OF THE ARIZONA UNIFORM STATE ANTITRUST ACT,
ARIZ. REV. STAT. § 44-1401 *ET SEQ.*
(AGAINST VISA ONLY)**

85.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and

every allegation set forth in the preceding paragraphs of this Complaint.

86.     In violation of Ariz. Rev. Stat. § 44-1401, Visa entered into contracts,

combinations, or conspiracies in restraint of trade for credit and charge card network services in

Arizona.

87.     Visa's violations of Arizona law were flagrant and willful.

88.     The Class has been injured in its business or property by Visa's violations of

Ariz. Rev. Stat. § 44-1401.

## CLAIM 2

### VIOLATION OF THE ARIZONA UNIFORM STATE ANTITRUST ACT,
### ARIZ. REV. STAT. § 44-1401 *ET SEQ.*
### (AGAINST MASTERCARD ONLY)

89.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and

every allegation set forth in the preceding paragraphs of this Complaint.

90.     In violation of Ariz. Rev. Stat. § 44-1401, MasterCard entered into contracts,

combinations, or conspiracies in restraint of trade for credit and charge card network services in

Arizona.

91.     MasterCard's violations of Arizona law were flagrant and willful.

92.     The Class has been injured in its business or property by MasterCard's violations

of Ariz. Rev. Stat. § 44-1401.

## CLAIM 3

### VIOLATION OF THE CALIFORNIA CARTWRIGHT ACT,
### CAL. BUS. & PROF. CODE § 16700 *ET SEQ.*
### (AGAINST VISA ONLY)

93.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and

every allegation set forth in the preceding paragraphs of this Complaint.

94.     Visa entered into agreements that are illegal "trusts," within the meaning of

California Business and Professions Code § 16720.  These agreements constitute "combination[s] of capital, skill or acts by two or more persons" in order to: "create or carry out restrictions in trade or commerce" (§16720(a)); "prevent competition in [the] sale or purchase of merchandise" (§ 16720(c)); and "fix [a] standard or figure, whereby [the] price" of credit and charge card network services "shall be…controlled or established" (§16720(d)).

95.     Under California antitrust law, Visa's No-Surcharge Rule is illegal per se.  The No-Surcharge Rule mandates that the merchant must offer Visa-branded credit card acceptance services to the merchant's customers for zero dollars.  The No-Surcharge Rule prevents merchants from selling Visa-card acceptance services to customers for any price and thus operates as a per se unlawful resale price maintenance device.

96.     Alternatively, if the rule of reason standard applies, California antitrust law principles dictate that Visa's conduct be evaluated under the "quick look" approach endorsed by the California Supreme Court in *In re Cipro Cases I & II,* 61 Cal. 4th 116, 146-47 (2015).  It is sufficiently obvious "that the arrangements in question would have an anticompetitive effect on customers and markets," that no "elaborate market analysis" is required.  *Id*.  Likewise, as discussed in Justice Breyer's dissenting opinion in *Ohio v. American Express*, 138 S. Ct. at 2296-97, "market-definition analysis [is] beside the point in the face of the District Court's findings of actual anticompetitive harm."  The "direct effects" standard articulated by Justice Breyer reflects the law of California.

97.     In any event, to the extent the Court conducts a full rule of reason analysis, the restraints caused adverse effects in the relevant markets and Visa has no procompetitive justification for the restraints.  Furthermore, even if Visa had procompetitive justifications for the restraints, such purported procompetitive benefits could be achieved via less restrictive means.

98.     The Class has been injured in its business or property by reason of Visa's violations of California Business and Professions Code § 16720.

## CLAIM 4

**VIOLATION OF THE CALIFORNIA CARTWRIGHT ACT,**
**CAL. BUS. & PROF. CODE § 16700 *ET SEQ.***
**(AGAINST MASTERCARD ONLY)**

99.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

100.     MasterCard entered into agreements that are illegal "trusts," within the meaning of California Business and Professions Code § 16720.  These agreements constitute "combination[s] of capital, skill or acts by two or more persons" in order to: "create or carry out restrictions in trade or commerce" (§16720(a)); "prevent competition in [the] sale or purchase of merchandise" (§ 16720(c)); and "fix [a] standard or figure, whereby [the] price" of credit and charge card network services "shall be…controlled or established" (§16720 (d)).

101.     Under California antitrust law, MasterCard's No-Surcharge Rule is illegal per se. The No-Surcharge Rule mandates that the merchant must offer MasterCard-branded credit card acceptance services to the merchant's customers for zero dollars.  The No-Surcharge Rule prevents merchants from selling Visa-card acceptance services to customers for any price and thus operates as a per se unlawful resale price maintenance device.

102.     Alternatively, if the rule of reason standard applies, California antitrust law principles dictate that MasterCard's conduct be evaluated under the "quick look" approach endorsed by the California Supreme Court in *In re Cipro Cases I & II,* 61 Cal. 4th 116, 146-47 (2015).  It is sufficiently obvious "that the arrangements in question would have an anticompetitive effect on customers and markets," that no "elaborate market analysis" is required.  *Id*.  Likewise, as discussed in Justice Breyer's dissenting opinion in *Ohio v. American*

*Express Co.*, 138 S. Ct. 2274, 2296-97 (2018), "market-definition analysis [is] beside the point in the face of the District Court's findings of actual anticompetitive harm." The "direct effects" standard articulated by Justice Breyer reflects the law of California.

103.    In any event, to the extent the Court conducts a full rule of reason analysis, the restraints caused adverse effects in the relevant markets and MasterCard has no procompetitive justification for the restraints. Furthermore, even if MasterCard had procompetitive justifications for the restraints, such purported procompetitive benefits could be achieved via less restrictive means.

104.    The Class has been injured in its business or property by reason of MasterCard's violations of California Business and Professions Code § 16720.

## CLAIM 5

### VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW, BUSINESS & PROFESSIONS CODE § 17200 (FOR INJUNCTIVE RELIEF AGAINST ALL DEFENDANTS)

105.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

106.    The Defendants' maintenance and imposition of restraints against surcharging and steering constitutes an "unlawful" business practice, within the meaning of Business & Professions Code section 17200, because such restraints violate the Cartwright Act and the federal Sherman Act.

107.    This action seeks "such orders or judgments. . . as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition," within the meaning of Business & Professions Code section 17203. Specifically, Plaintiffs seek

injunctive relief that would rescind all restraints on merchant surcharging.  In addition, Plaintiffs seek an order directing Defendants to inform consumers—i.e., the general public—that merchant surcharging is permissible.

## CLAIM 6

### VIOLATION OF THE CONNNECTICUT ANTITRUST ACT
### CONN. GEN. STAT. § 35-24 *ET SEQ.*
### (AGAINST VISA ONLY)

108.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

109.     In violation of Conn. Gen. Stat. § 35-28, Visa entered into contracts, combinations or conspiracies for the purpose or with the effect of restraining trade for credit and charge card network services in Connecticut.

110.     The Class has been injured in its business or property by Visa's violations of Conn. Gen. Stat. § 35-28.

## CLAIM 7

### VIOLATION OF THE CONNNECTICUT ANTITRUST ACT
### CONN. GEN. STAT. § 35-24 *ET SEQ.*
### (AGAINST MASTERCARD ONLY)

111.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

112.     In violation of Conn. Gen. Stat. § 35-28, MasterCard entered into contracts, combinations or conspiracies for the purpose or with the effect of restraining trade for credit and charge card network services in Connecticut.

113.     The Class has been injured in its business or property by MasterCard's violations of Conn. Gen. Stat. § 35-28.

## CLAIM 8

### VIOLATION OF THE DISTRICT OF COLUMBIA ANTITRUST ACT, D.C. CODE § 28-4501 *ET SEQ.* (AGAINST VISA ONLY)

114.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

115.    In violation of D.C. Code § 28-4502, Visa entered into contracts, combinations in the form of trusts or otherwise, or conspiracies in restraint of trade for credit and charge card network services in the District of Columbia.

116.    The Class has been injured in its business or property by reason of Visa's violations of D.C. Code § 28-4502.

## CLAIM 9

### VIOLATION OF THE DISTRICT OF COLUMBIA ANTITRUST ACT, D.C. CODE § 28-4501 *ET SEQ.* (AGAINST MASTERCARD ONLY)

117.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

118.    In violation of D.C. Code § 28-4502, MasterCard entered into contracts, combinations in the form of trusts or otherwise, or conspiracies in restraint of trade for credit and charge card network services in the District of Columbia.

119.    The Class has been injured in its business or property by reason of MasterCard's violations of D.C. Code § 28-4502.

## CLAIM 10

### VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT, FLA. STAT. § 501.201 (AGAINST VISA ONLY)

120.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

121.     The Florida Deceptive and Unfair Trade Practices Act provides a right of action to indirect purchasers to recover for "unfair methods of competition," including violations of antitrust law.

122.     Visa's anticompetitive conduct described above constitutes "unfair methods of competition," within the meaning of the FDUTPA.

## CLAIM 11

### VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT, FLA. STAT. § 501.201
### (AGAINST MASTERCARD ONLY)

123.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

124.     The FDUTPA provides a right of action to indirect purchasers to recover for "unfair methods of competition," including violations of antitrust law.

125.     Mastercard's anticompetitive conduct described above constitutes "unfair methods of competition," within the meaning of the FDUTPA.

## CLAIM 12

### VIOLATION OF THE HAWAII ANTITRUST STATUTE
### HAW. REV. STAT. § 480-4
### (AGAINST VISA ONLY)

126.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

127.    In violation of Haw. Rev. Stat. § 480-4, Visa entered into contracts, combinations in the form of trusts or otherwise, or conspiracies in restraint of trade for credit and charge card network services in Hawaii.

128.    The Class has been injured in its business or property by reason of Visa's violations of Haw. Rev. Stat. § 480-4.

## CLAIM 13

### VIOLATION OF THE HAWAII ANTITRUST STATUTE
### HAW. REV. STAT. § 480-4
### (AGAINST MASTERCARD ONLY)

129.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

130.    In violation of Haw. Rev. Stat. § 480-4, MasterCard entered into contracts, combinations in the form of trusts or otherwise, or conspiracies in restraint of trade for credit and charge card network services in Hawaii.

131.    The Class has been injured in its business or property by reason of MasterCard's violations of Haw. Rev. Stat. § 480-4.

## CLAIM 14

### VIOLATION OF THE ILLINOIS ANTITRUST ACT,
### 740 ILL. COMP. STAT. ANN. 10/3 *ET SEQ.*
### (AGAINST VISA ONLY)

132.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

133.    Visa made contracts with, or engaged in combinations or conspiracies with, other persons who are, or but for a prior agreement would be, a competitor of such person for the purpose or with the effect of fixing, controlling, or maintaining the price or rate charged for any

fee charged or paid for credit and charge card network services performed by the parties thereto in Illinois.

134.    Visa fixed, controlled, or maintained the sale or supply of credit and charge card network services, for the purpose or with the effect of fixing, controlling, or maintaining the price or rate charged or paid for credit and charge card network services in Illinois.

135.    By contract, combination or conspiracy, Visa unreasonably restrained trade or commerce for credit and charge card network services in Illinois.

136.    By reason of the foregoing, Visa violated the Illinois Antitrust Act, 740 ILCS 10/3.

137.    Visa's violations of the Illinois Antitrust Act were willful and flagrant.

138.    The Class has been injured in its business or property by reason of Visa's violations of the Illinois Antitrust Act, 740 ILCS 10/3.

## CLAIM 15

### VIOLATION OF ILLINOIS ANTITRUST ACT, 740 ILL. COMP. STAT. ANN. 10/3 *ET SEQ.* (AGAINST MASTERCARD ONLY)

139.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

140.    MasterCard made contracts with, or engaged in combinations or conspiracies with, other persons who are, or but for a prior agreement would be, a competitor of such person for the purpose or with the effect of fixing, controlling, or maintaining the price or rate charged for any fee charged or paid for credit and charge card network services performed by the parties thereto in Illinois.

141.    MasterCard fixed, controlled, or maintained the sale or supply of credit and

35

charge card network services, for the purpose or with the effect of fixing, controlling, or maintaining the price or rate charged or paid for credit and charge card network services in Illinois.

142.    By contract, combination or conspiracy, MasterCard unreasonably restrained trade or commerce for credit and charge card network services in Illinois.

143.    By reason of the foregoing, MasterCard violated the Illinois Antitrust Act, 740 ILCS 10/3.

144.    MasterCard's violations of the Illinois Antitrust Act were willful and flagrant.

145.    The Class has been injured in its business or property by reason of MasterCard's violations of the Illinois Antitrust Act, 740 ILCS 10/3.

## CLAIM 16

### VIOLATION OF IOWA COMPETITION LAW
### IOWA CODE § 553.1 *ET SEQ.*
### (AGAINST VISA ONLY)

146.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

147.    In violation of Iowa Code § 553.4, Visa entered into contracts, combinations and conspiracies with others that restrained trade or commerce in the market for credit and charge card network services in Iowa.

148.    Visa's violations of Iowa Code § 553.4 were willful and flagrant.

149.    The Class has been injured by reason of Visa's violations of the Iowa Competition Law, Iowa Code § 553.1, *et seq.*

## CLAIM 17

### VIOLATION OF IOWA COMPETITION LAW

**IOWA CODE § 553.1 *ET SEQ.***
**(AGAINST MASTERCARD ONLY)**

150.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

151.     In violation of Iowa Code § 553.4, MasterCard entered into contracts, combinations and conspiracies with others that restrained trade or commerce in the market for credit and charge card network services in Iowa.

152.     MasterCard's violations of Iowa Code § 553.4 were willful and flagrant.

153.     The Class has been injured by reason of MasterCard's violations of the Iowa Competition Law, Iowa Code § 553.1, *et seq.*

## CLAIM 18

**VIOLATION OF THE KANSAS RESTRAINT OF TRADE ACT,**
**KAN. STAT. ANN. § 50-101 *ET SEQ.***
**(AGAINST VISA ONLY)**

154.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

155.     In violation of Kan. Stat. Ann. § 50-101, *et seq.*, Visa entered into arrangements, contracts, agreements, trusts, or combinations between others made with a view toward preventing or which tend to prevent full and free competition for the provision of credit and charge card network services in Kansas.

156.     The Class has been injured by reason of Visa's violations of the Kansas Restraint of Trade Act, Kan. Stat. Ann. § 50-101, *et seq*.

## CLAIM 19

**VIOLATION OF THE KANSAS RESTRAINT OF TRADE ACT,**
**KAN. STAT. ANN. § 50-101 *ET SEQ.***
**(AGAINST MASTERCARD ONLY)**

157.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

158.     In violation of Kan. Stat. Ann. § 50-101, *et seq.*, MasterCard entered into arrangements, contracts, agreements, trusts, or combinations between others made with a view toward preventing or which tend to prevent full and free competition for the provision of credit and charge card network services in Kansas.

159.     The Class has been injured by reason of MasterCard's violations of the Kansas Restraint of Trade Act, Kan. Stat. Ann. § 50-101, *et seq.*

## CLAIM 20

**VIOLATION OF MAINE'S MONOPOLIES & PROFITEERING LAW
ME. REV. STAT. ANN. TIT. 10, § 1101 *ET SEQ.*
(AGAINST VISA ONLY)**

160.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

161.     In violation of ME. Rev. Stat. Ann. Tit. 10, § 1101, Visa entered into contracts, combinations in the forms of trust or otherwise and conspiracies in restraint of trade for credit and charge card network services.

162.     The Class has been injured in its business or property by reason of Visa's violations of ME. Rev. Stat. Ann. Tit. 10, § 1101.

## CLAIM 21

**VIOLATION OF MAINE'S MONOPOLIES & PROFITEERING LAW
ME. REV. STAT. ANN. TIT. 10, § 1101 *ET SEQ.*
(AGAINST MASTERCARD ONLY)**

163.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

164.     In violation of ME. Rev. Stat. Ann. Tit. 10, § 1101, MasterCard entered into contracts, combinations in the forms of trust or otherwise and conspiracies in restraint of trade for credit and charge card network services.

165.     The Class has been injured in its business or property by reason of MasterCard's violations of ME. Rev. Stat. Ann. Tit. 10, § 1101.

## CLAIM 22

### VIOLATION OF MICHIGAN ANTITRUST REFORM ACT
### MICH. COMP. LAW ANN. § 445.772
### (AGAINST VISA ONLY)

166.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

167.     In violation of Mich. Comp. Law Ann. § 445.772, Visa entered into contracts, combinations or conspiracies in restraint of trade in the market for credit and charge card network services in Michigan.

168.     Visa's violations of Mich. Comp. Law Ann. § 445.772 were flagrant and willful.

169.     The Class has been injured in its business or property by Visa's violations of Mich. Comp. Law Ann. § 445.772.

## CLAIM 23

### VIOLATION OF MICHIGAN ANTITRUST REFORM ACT
### MICH. COMP. LAW ANN. § 445.772
### (AGAINST MASTERCARD ONLY)

170.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

171.     In violation of Mich. Comp. Law Ann. § 445.772, MasterCard entered into contracts, combinations or conspiracies in restraint of trade in the market for credit and charge card network services in Michigan.

172.     MasterCard's violations of Mich. Comp. Law Ann. § 445.772 were flagrant and willful.

173.     The Class has been injured in its business or property by MasterCard's violations of Mich. Comp. Law Ann. § 445.772.

## CLAIM 24

### VIOLATION OF MINNESOTA ANTITRUST LAW
### MINN. STAT. § 325D.49 *ET SEQ.*
### (AGAINST VISA ONLY)

174.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

175.     In violation of Minn. Stat. § 325D.54, Visa entered into contracts, combinations or conspiracies that caused the price of credit and charge card network services in Minnesota to increase.

176.     The Class was injured by Visa's violations of Minn. Stat. § 325D.54.

## CLAIM 25

### VIOLATION OF MINNESOTA ANTITRUST LAW
### MINN. STAT. § 325D.49 *ET SEQ.*
### (AGAINST MASTERCARD ONLY)

177.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

178.     In violation of Minn. Stat. § 325D.54, MasterCard entered into contracts, combinations or conspiracies that caused the price of credit and charge card network services in Minnesota to increase.

179.     The Class was injured by MasterCard's violations of Minn. Stat. § 325D.54.

## CLAIM 26

### VIOLATION OF MISSISSIPPI ANTITRUST STATUTE

**MS CODE § 75-21-1 *ET SEQ.***
**(AGAINST VISA ONLY)**

180.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

181.     Visa entered into combinations, contracts, understandings or agreements, expressed or implied, between two or more persons, corporations or firms or associations of persons, or between any one or more of either with one or more of the others, which restrained trade for credit and charge card network services in Mississippi.

182.     By reason of the foregoing, Visa violated MS Code § 75-21-1 *et seq*.

183.     The Class has been injured by, and by the effects of, Visa's violations of MS Code § 75-21-1 *et seq*.

**CLAIM 27**

**VIOLATION OF MISSISSIPPI ANTITRUST STATUTE**
**MS CODE § 75-21-1 *ET SEQ.***
**(AGAINST MASTERCARD ONLY)**

184.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

185.     MasterCard entered into combinations, contracts, understandings or agreements, expressed or implied, between two or more persons, corporations or firms or associations of persons, or between any one or more of either with one or more of the others, which restrained trade for credit and charge card network services in Mississippi.

186.     By reason of the foregoing, MasterCard violated MS Code § 75-21-1 *et seq*.

187.     The Class has been injured by, and by the effects of, MasterCard's violations of MS Code § 75-21-1 *et seq*.

**CLAIM 28**

41

**VIOLATION OF THE NEBRASKA JUNKIN ACT**
**NEB. REV. STAT. § 59-801, *ET SEQ.***
**(AGAINST VISA ONLY)**

188.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

189.     In violation of Neb. Rev. Stat. § 59-801, Visa has entered into contracts, combinations in the form of trust or otherwise, or conspiracies which restrained trade for credit and charge card network services in Nebraska.

190.     The Class has been injured in its business or property by Visa's violations of Neb. Rev. Stat. § 59-801.

## CLAIM 29

**VIOLATION OF THE NEBRASKA JUNKIN ACT**
**NEB. REV. STAT. § 59-801, *ET SEQ.***
**(AGAINST MASTERCARD ONLY)**

191.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

192.     In violation of Neb. Rev. Stat. § 59-801, MasterCard has entered into contracts, combinations in the form of trust or otherwise, or conspiracies which restrained trade for credit and charge card network services in Nebraska.

193.     The Class has been injured in its business or property by MasterCard's violations of Neb. Rev. Stat. § 59-801.

## CLAIM 30

**VIOLATION OF THE NEVADA UNFAIR TRADE PRACTICE ACT**
**NEV. REV. STAT. § 598A.060**
**(AGAINST VISA ONLY)**

194.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

195.    In violation of Nev. Rev. Stat. § 598A.060, Visa entered into contracts, combinations or conspiracies which substantially lessened competition and restrained trade for credit and charge card network services in Nevada.

196.    The Class has been injured in its business or property by reason of Visa's violations of Nev. Rev. Stat. § 598A.060.

## CLAIM 31

### VIOLATION OF THE NEVADA UNFAIR TRADE PRACTICE ACT
### NEV. REV. STAT. § 598A.060
### (AGAINST MASTERCARD ONLY)

197.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

198.    In violation of Nev. Rev. Stat. § 598A.060, MasterCard entered into contracts, combinations or conspiracies which substantially lessened competition and restrained trade for credit and charge card network services in Nevada.

199.    The Class has been injured in its business or property by reason of MasterCard's violations of Nev. Rev. Stat. § 598A.060.

## CLAIM 32

### VIOLATION OF THE NEW HAMPSHIRE ANTITRUST STATUTE
### N.H. REV. STAT. ANN. TIT. XXXI, § 356, *ET SEQ.*
### (AGAINST VISA ONLY)

200.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

201.    In violation of N.H. Rev. Stat. 356:2, Visa entered into contracts, combinations or conspiracies that restrained trade and controlled and maintained rates and fees charged for credit and charge card network services in New Hampshire.

202.    Visa's violations of N.H. Rev. Stat. 356:2 were willful and flagrant.

203.     The Class has been injured in its business or property by reason of VISA's violations of N.H. Rev. Stat. 356:2.

## CLAIM 33

### VIOLATION OF THE NEW HAMPSHIRE ANTITRUST STATUTE
### N.H. REV. STAT. ANN. TIT. XXXI, § 356, *ET SEQ.*
### (AGAINST MASTERCARD ONLY)

204.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

205.     In violation of N.H. Rev. Stat. 356:2, MasterCard entered into contracts, combinations or conspiracies that restrained trade and controlled and maintained rates and fees charged for credit and charge card network services in New Hampshire.

206.     MasterCard's violations of N.H. Rev. Stat. 356:2 were willful and flagrant.

207.     The Class has been injured in its business or property by reason of MasterCard's violations of N.H. Rev. Stat. 356:2.

## CLAIM 34

### VIOLATION OF THE NEW MEXICO ANTITRUST ACT
### N.M. STAT. 57-1-1 *ET SEQ.*
### (AGAINST VISA ONLY)

208.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

209.     In violation of N.M. Stat. § 57-1-1, Visa entered into contracts, agreements, combinations or conspiracies that restrained trade for credit and charge card network services in New Mexico.

210.     The Class has been injured in its business or property by Visa's violations of N.M. Stat. § 57-1-1.

## CLAIM 35

44

**VIOLATION OF THE NEW MEXICO ANTITRUST ACT**
**N.M. STAT. 57-1-1 *ET SEQ.***
**(AGAINST MASTERCARD ONLY)**

211.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

212.     In violation of N.M. Stat. § 57-1-1, MasterCard entered into contracts, agreements, combinations or conspiracies that restrained trade for credit and charge card network services in New Mexico.

213.     The Class has been injured in its business or property by MasterCard's violations of N.M. Stat. § 57-1-1.

## CLAIM 36

**VIOLATION OF THE NEW YORK DONNELLY ACT**
**NEW YORK GENERAL BUSINESS LAW § 340**
**(AGAINST VISA ONLY)**

214.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

215.     In violation of New York General Business Law § 340, Visa entered into contracts, agreements, arrangements or combinations that have restrained trade in the competition for credit and charge card network services in New York.

216.     The Class has sustained damages by reason of Visa's violations of New York General Business Law § 340.

## CLAIM 37

**VIOLATION OF THE NEW YORK DONNELLY ACT**
**NEW YORK GENERAL BUSINESS LAW § 340**
**(AGAINST MASTERCARD ONLY)**

217.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and

every allegation set forth in the preceding paragraphs of this Complaint.

218.    In violation of New York General Business Law § 340, MasterCard entered into contracts, agreements, arrangements or combinations that have restrained trade in the competition for credit and charge card network services in New York.

219.    The Class has sustained damages by reason of MasterCard's violations of New York General Business Law § 340.

## CLAIM 38

**VIOLATION OF CHAPTER 75 OF NORTH CAROLINA GENERAL STATUTES
N.C. GEN. STAT. 75-1, *ET SEQ.*
(AGAINST VISA ONLY)**

220.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

221.    In violation of N.C. Gen. Stat. 75-1, Visa entered into contracts, combinations in the form of trust or otherwise, or conspiracies in restraint of trade for credit and charge card network services in North Carolina.

222.    The Class has been injured by Visa's violations of N.C. Gen. Stat. § 75-1.

## CLAIM 39

**VIOLATION OF CHAPTER 75 OF NORTH CAROLINA GENERAL STATUTES
N.C. GEN. STAT. 75-1, *ET SEQ.*
(AGAINST MASTERCARD ONLY)**

223.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

224.    In violation of N.C. Gen. Stat. 75-1, MasterCard entered into contracts, combinations in the form of trust or otherwise, or conspiracies in restraint of trade for credit and charge card network services in North Carolina.

225.    The Class has been injured by MasterCard's violations of N.C. Gen. Stat. § 75-1.

## CLAIM 40

**VIOLATION OF THE NORTH DAKOTA UNIFORM STATE ANTITRUST ACT
N.D. CENT. CODE § 51-08.1, *ET SEQ.*
(AGAINST VISA ONLY)**

226.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

227.    In violation of N.D. Cent. Code § 51-08.1-02, Visa entered into contracts, combinations or conspiracies in restraint of trade in the market for credit and charge card network services in North Dakota.

228.    Visa's violations of N.D. Cent. Code § 51-08.1-02 were flagrant and willful.

229.    The Class has been injured in its business or property by Visa's violations of N.D. Cent. Code § 51-08.1-02.

## CLAIM 41

**VIOLATION OF THE NORTH DAKOTA UNIFORM STATE ANTITRUST ACT
N.D. CENT. CODE § 51-08.1, *ET SEQ.*
(AGAINST MASTERCARD ONLY)**

230.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

231.    In violation of N.D. Cent. Code § 51-08.1-02, MasterCard entered into contracts, combinations or conspiracies in restraint of trade in the market for credit and charge card network services in North Dakota.

232.    MasterCard's violations of N.D. Cent. Code § 51-08.1-02 were flagrant and willful.

233.    The Class has been injured in its business or property by MasterCard's violations of N.D. Cent. Code § 51-08.1-02.

## CLAIM 42

**VIOLATION OF THE RHODE ISLAND ANTITRUST ACT**
**R.I. GEN LAWS § 6-36-1, *ET SEQ.***
**(AGAINST VISA ONLY)**

234.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

235.     In violation of R.I. Gen Laws § 6-36-4, Visa entered into contracts, combinations or conspiracies in restraint of trade for credit and charge card network services in Rhode Island.

236.     The Class has been injured in its business or property by reason of Visa's violations of R.I. Gen Laws § 6-36-4.

## CLAIM 43

**VIOLATION OF THE RHODE ISLAND ANTITRUST ACT**
**R.I. GEN LAWS § 6-36-1, *ET SEQ.***
**(AGAINST MASTERCARD ONLY)**

237.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

238.     In violation of R.I. Gen Laws § 6-36-4, MasterCard entered into contracts, combinations or conspiracies in restraint of trade for credit and charge card network services in Rhode Island.

239.     The Class has been injured in its business or property by reason of MasterCard's violations of R.I. Gen Laws § 6-36-4.

## CLAIM 44

**VIOLATION OF THE SOUTH DAKOTA ANTITRUST STATUTE**
**S.D. CODIFIED LAWS § 37-1-3.1, *ET SEQ.***
**(AGAINST VISA ONLY)**

240.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and

every allegation set forth in the preceding paragraphs of this Complaint.

241.     In violation of S.D. Codified Laws § 37-1-3.1, Visa entered into contracts, combinations or conspiracies in restraint of trade for credit and charge card network services in South Dakota.

242.     The Class has been injured in its business or property by Visa's violations of S.D. Codified Laws § 37-1-3.1.

### CLAIM 45

**VIOLATION OF THE SOUTH DAKOTA ANTITRUST STATUTE**
**S.D. CODIFIED LAWS § 37-1-3.1, *ET SEQ.***
**(AGAINST MASTERCARD ONLY)**

243.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

244.     In violation of S.D. Codified Laws § 37-1-3.1, MasterCard entered into contracts, combinations or conspiracies in restraint of trade for credit and charge card network services in South Dakota.

245.     The Class has been injured in its business or property by MasterCard's violations of S.D. Codified Laws § 37-1-3.1.

### CLAIM 46

**VIOLATION OF THE UTAH ANTITRUST ACT**
**UTAH CODE § 76-10-911, *ET SEQ.***
**(AGAINST VISA ONLY)**

246.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

247.     In violation of Utah Code § 76-10-3104, Visa entered into contracts, combinations in the form of trust or otherwise, or conspiracies in restraint of trade for credit and charge card network services in Utah.

248.     The Class has been injured in its business or property by Visa's violation of §

76-10-3104.

## CLAIM 47

### VIOLATION OF THE UTAH ANTITRUST ACT
### UTAH CODE § 76-10-911, *ET SEQ.*
### (AGAINST MASTERCARD ONLY)

249.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and

every allegation set forth in the preceding paragraphs of this Complaint.

250.     In violation of Utah Code § 76-10-3104, MasterCard entered into contracts,

combinations in the form of trust or otherwise, or conspiracies in restraint of trade for credit and

charge card network services in Utah.

251.     The Class has been injured in its business or property by MasterCard's violation

of § 76-10-3104.

## CLAIM 48

### VIOLATION OF THE VERMONT CONSUMER FRAUD ACT
### 9 V.S.A. § 2453
### (AGAINST VISA ONLY)

252.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and

every allegation set forth in the preceding paragraphs of this Complaint.

253.     In violation of 9 V.S.A. § 2453, Visa engaged in unfair methods of competition

and unfair acts or practices in connection with the provision of credit and charge card network

services in Vermont.

254.     The Class has sustained damages or injury as a result of Visa's violations of 9

V.S.A. § 2453.

## CLAIM 49

### VIOLATION OF THE VERMONT CONSUMER FRAUD ACT

50

**9 V.S.A. § 2453**
**(AGAINST MASTERCARD ONLY)**

255.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

256.     In violation of 9 V.S.A. § 2453, MasterCard engaged in unfair methods of competition and unfair acts or practices in connection with the provision of credit and charge card network services in Vermont.

257.     The Class has sustained damages or injury as a result of MasterCard's violations of 9 V.S.A. § 2453.

## CLAIM 50

**VIOLATION OF THE WEST VIRGINIA ANTITRUST ACT**
**W. VA. CODE § 47-18-1, *ET SEQ.***
**(AGAINST VISA ONLY)**

258.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

259.     In violation of W. VA. Code § 47-18-3, Visa entered into contracts, combinations in the form of trusts or otherwise, or conspiracies in restraint of trade for credit and charge card network services in West Virginia and for the purpose or effect of controlling or maintaining the rate or fee charged for credit and charge card network services in West Virginia.

260.     The Class has been injured in its business or property by reason of Visa's violations of W. VA. Code § 47-18-3.

## CLAIM 51

**VIOLATION OF THE WEST VIRGINIA ANTITRUST ACT**
**W. VA. CODE § 47-18-1, *ET SEQ.***
**(AGAINST MASTERCARD ONLY)**

261.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and

51

every allegation set forth in the preceding paragraphs of this Complaint.

262.     In violation of W. VA. Code § 47-18-3, MasterCard entered into contracts, combinations in the form of trusts or otherwise, or conspiracies in restraint of trade for credit and charge card network services in West Virginia and for the purpose or effect of controlling or maintaining the rate or fee charged for credit and charge card network services in West Virginia.

263.     The Class has been injured in its business or property by reason of MasterCard's violations of W. VA. Code § 47-18-3.

## CLAIM 52

### VIOLATION OF THE WISCONSIN ANTITRUST ACT
### WIS. STAT. ANN. § 133.01, *ET SEQ.*
### (AGAINST VISA ONLY)

264.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

265.     In violation of Wis. Stat. Ann. § 133.03, Visa entered into contracts, combinations in the form of trusts or otherwise or conspiracies in restraint of trade for credit and charge card network services in Wisconsin.

266.     The Class has been injured by reason of Visa's violations of Wis. Stat. Ann. § 133.03.

## CLAIM 53

### VIOLATION OF THE WISCONSIN ANTITRUST ACT
### WIS. STAT. ANN. § 133.01, *ET SEQ.*
### (AGAINST MASTERCARD ONLY)

267.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

268.     In violation of Wis. Stat. Ann. § 133.03, MasterCard entered into contracts, combinations in the form of trusts or otherwise or conspiracies in restraint of trade for credit and

charge card network services in Wisconsin.

269.   The Class has been injured by reason of MasterCard's violations of Wis. Stat. Ann. § 133.03.

## XI.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request an Order:

a.   Certifying this case as a class action;

b.   Directing Defendants to rescind their rules restraining credit-card surcharging and ordering them to communicate broadly to consumers that merchant surcharging is permissible;

c.   Awarding the Class the maximum monetary relief allowed under each of the state statutes set forth above;

d.   Awarding the Class pre-judgment and post-judgment interest;

e.   Awarding the Class its reasonable attorneys' fees and costs of suit; and

f.   Granting such other and further relief as the Court deems just and proper.

## XII.  JURY TRIAL DEMAND

Plaintiffs demand a trial by jury of all issues so triable.


DATED:  June 16, 2021                    **WOLF HALDENSTEIN ADLER**
                                         **FREEMAN & HERZ LLP**

                                         by:  _s/ Mark C. Rifkin_
                                         Mark C. Rifkin
                                         Thomas H. Burt
                                         270 Madison Ave., 9th Floor
                                         New York, New York 10016
                                         Tel.: (212) 545-4600; Fax: (212) 686-0114
                                         rifkin@whafh.com
                                         burt@whafh.com

**PEARSON, SIMON & WARSHAW, LLP**
Daniel L. Warshaw
Benjamin E. Shiftan
15165 Ventura Blvd. #400
Sherman Oaks, CA  91403
Tel.: (818) 788-8300
Fax: (818) 788-8104
dwarshaw@pswlaw.com
bshiftan@pswlaw.com

**MARKUN ZUSMAN FRENIERE**
**& COMPTON LLP**
David Markun
Edward Zusman
17383 Sunset Blvd.,
Pacific Palisades, CA  90272
Tel: (310) 454-5900
dmarkun@mzclaw.com
ezusman@mzclaw.com

**KIESEL LAW LLP**
Jeffrey A. Koncius
8648 Wilshire Blvd.
Beverly Hills, CA  90211
Tel.: (310) 854-4444
koncius@kiesel.law

**SONG P.C.**
David Song
Tracey Kitzman
26 Broadway, Fl 8
New York, NY 10004
Tel: 212-599-0700

*Counsel for Plaintiffs*